GREEN ET AL *v.* MORRIS ET AL.

[78 South. 550, Division B.]

1. MORTGAGES. *Assignment of part of debt. Bona-fide purchasers.* Where a series of notes are all secured by a common deed of trust and a common security, the holders of the notes are entitled to share *pro rata* in case the security is not sufficient to pay all.

2. SAME.
A *bona-fide* purchaser without notice from the indorsee of part of a series of notes secured by a trust deed are not affected by a collateral agreement between the payee and his indorsee, that the notes retained should have priority of payment over those endorsed, but in such case they are entitled to share *pro rata*.

3. MORTGAGES. *Notes. Indorsers. Liability.*

Where the payee and his endorsee of part of a series of purchase money notes secured by a trust deed collaterally agreed that the notes retained by the payee should have priority as to security and the indorsed notes have passed to a *bona-fide* purchaser without notice of such agreement, and the security is prorated between such holder and the payee to the latter's loss, in such case the payee is entitled to judgment against his indorsee, for such loss.

4. SAME.

If the payee's signature is forged by one in possession of a part of a series of notes secured by a trust deed, a *bona-fide* purchaser is postponed to the rights of the payee in the security and in such case the purchaser takes only the rights of his transferror.

APPEAL from the chancery court of Union county. HON. A. J. McINTYRE, Chancellor.

Suit by E. E. Green and others against J. R. Morris and others. From the judgment rendered, plaintiff appeals.

The facts are fully stated in the opinion of the court.

*Jones & Knox,* for appellant.

The court erred in holding that the notes owned by the appellee, Morris, had priority. There is nothing in the face of the notes, or in the deed of trust securing the notes showing there was any priority given one note mentioned in the deed of trust over that of another; the notes sued on by appellant were all secured by the same deed of trust and all matured at the time of the trial of said cause. And all of said notes should have shared *pro rata* in the proceeds of the sale of the land and the property described in the deed of trust securing said notes. It appears to be the settled law in this state that all debts protected by the same security are entitled to share *pro rata* in its proceeds. *Henderson* v. *Herrod,* 10 S. & M. 631; *Bank of Eng-*

*land* v. *Tarleton,* 23 Miss. 173; *Pugh* v. *Holt,* 27 Miss.
461; *Goar et al.* v. *McCanless,* 60 Miss. 248.

The undisputed proof shows that the appellants were
*bona-fide* purchasers for value, before maturity, in due
course of trade of the notes sued on in their bill in the
court below and said deed of trust securing said notes
and the notes mentioned therein fail to recite or give
any notice whatever of any priority or preference in
the payment of said notes.    But said deed of trust
specifically provides that out of the proceeds of the sale
of the property, the full amount of the debt mentioned
therein shall be paid by the trustee.

The appellee aided and assisted in putting these notes
notes held by them, and they are not to be prejudiced
by any secret equity of priority that the appellee may
claim to have reserved.

The appellee aided and assisted in putting these notes
on the market in the manner and form they are now in.
He certainly has no priority over an innocent purchas-
er of notes that appellee himself helped to put upon
the market.  *Jefferson College* v. *Prentiss,* 39 Miss. 46.

There is nothing to show there is sufficient property
to pay all the debt secured, in fact there is not.    The
appellee has already disposed of much of the property
covered by the deed of trust for a small amount, and
the record indicates there is not now enough property
left to pay the debt secured by the trust deed.    If
there was even a probability of any balance after pay-
ing the debt against the land, that balance under the
pleading and facts, should be paid J. L. Sanders the
last purchaser, but he is not here complaining.

Second, the court erred in holding that the indorse-
ment of the notes held and owned by E. E. Green and
the Merchants and Mechanics Bank was without con-
sideration and not binding.  If J. R. Morris had not
indorsed the notes, the stock of goods received by J.
R. Morris and referred to in the signed agreement was

consideration for the notes, but when J. R. Morris, appellee, indorsed the notes, he then warranted the validity of the notes, and also that there was no legal defense growing out of his own connection with the notes. Also, in said agreement said Morris agrees to convey all three of said notes held by appellant to T. J. Morris. 7 Cyc., page 831 and 832; *Hawkins* v. *Shields,* 57 So. 4.

Third, there was error by the court in not deciding the issue as to appellee indorsing the notes held and owned by appellants Green and the Merchants and Mechanics Bank. This issue was squarely before the court; was a most material issue to appellant's rights and about the only issue hotly contested before the court. If the appellee, Morris, indorsed the notes, these two appellants not only had the right to a *pro rata* share of the proceeds of the sale of the property covered by the deed of trust, but were entitled to a personal decree against the appellee, Morris. We think the evidence both oral and by depositions and that shown by comparison of the handwriting of the appellee, Morris, clearly show that the appellee indorsed the notes sued on. An effort will be made to show this court part of the handwriting of the appellee used as comparative evidence in the court below. As many of the comparisons were made from the public records, that part of the evidence cannot be conveniently produced in this court on appeal. If appellee indorsed the notes sued on, then the principles governing the rights of the appellants holding said notes are elementary, and authorities need not be cited. Surely, the appellee must have indorsed the notes sued on. The signature is too much like other signatures he made not to be his. But little weight can be given appellees denial of his signature on the notes, when he could not even be certain about his signature of his sworn answer in this case, and would not be until he was certain it was his answer. He agreed in writing to convey said notes and did so.

Fourth, it was error on the part of the court not to find and decree the amounts due the appellants as well as that of the appellee. It is true the clerk and commissioner might find the correct amount due appellants and might properly pro rate the balance if any; but, this is not a judicial finding of the amounts due under the mortgage. On judgment or decrees foreclosing mortgages, see 27 Cyc., pages 1641 and 1642.

We respectfully submit that the decree of the court below should be reversed and proper decree entered here fixing the rights of the appellants.

*L. R. Kenneday,* for appellee.

The indorsement of the notes sued on was wholly without consideration. Appellee did not get one cent benefit from the transfer; in fact if the scheme disclosed by appellants bill is carried out, it means that appellee not only gets nothing out of the sale of his place, but must actually pay his brother, forty per cent. of the entire face value of the notes, amounting to a virtual loss of the place to him and this is but a fair sample of the equity of appellant's bill. The consideration failed absolutely. See 7 Cyc., pp. 690 to 700, inclusive, and the notes, etc. The learned chancellor, heard the evidence, passed on it, and this court will not disturb his finding. By failing to include appellant T. J. Morris, as a party defendant who is also an indorser of the notes, and who is (according to the original bill) perfectly solvent, appellants are in no position to complain of the decree in this case, the lower court simply meant to refer appellants to their co-complainant, T. J. Morris, on his indorsement of these notes, he being perfectly solvent according to the allegations of their own answer to cross-bill, which the answer does not deny. No one can deny under the proof in this case the fraud of appellant, T. J. Morris, against appellee

J. R. Morris. This fraud had the effect to destroy any right which T. J. Morris may have had against his brother, J. R. Morris, and if T. J. Morris could not recover on his brother's indorsement, certainly no subsequent holder could, for they have no more title, or greater rights than he had and are limited to his rights in this proceeding against appellee, J. R. Morris. No sane man would think of giving a commission of forty per cent. to get his land sold on a credit, with no security whatever, and indorse the commission notes. No honest man would take a forty per cent. commission from his brother (as in this case) and require him to indorse the commission notes and thus bind himself for the absolute payment of the commission regardless of whether the sale was carried out or not, etc. Even if old man J. R. Morris did make such a contract, a court of equity would not allow it to stand, under the proof in this case, for appellee says that he left it wholly and entirely with his brother, T. J. Morris; never saw the commission notes until they were sent to New Albany for collection; was not present when papers were executed; knew nothing whatever, except what his brother told him. Learned counsel in their brief fail to note the difference between indorsements made in due course of trade and indorsements fraudulently obtained. Hence the citation of 7 Cyc., pp. 831-2 what the learned writer has to say there, is with reference to defenses, other than fraud. This authority says: "The transferer of commercial paper, even where indorsed, "without recourse" warrants the validity of the instrument. Thus he (T. J. Morris) is held impliedly to warrant that the paper is supported by a valid consideration; that it was properly stamped that prior parties had capacity to contract; that the instrument is still subsisting as a valid obligation; and in general, that there is no legal defense growing out of his own connection with the paper." This fits our

case against T. J. Morris, and he is the only man whoever got a dime out of this sale. The decree gives T. J. Morris full credit for the goods he claims to have let his brother have in this deal, so he has no complaint on this score. All cases referred to by counsel for appellant, announce the rule that where different notes are secured by the same trust deed, they should share *pro rata,* in proceeds of sale of the property securing the same, which is elementary law, and was not and is not denied by appellee. This rule is not involved however in this cause. Appellee defended in the lower court, first, that he did not indorse the notes sued on; and second, that complainant, T. J. Morris, who conducted this sale, understood, promised and agreed that in fixing the papers, appellee, should have priority as to the purchase price of his land, and that the complainant's notes should be paid later. Record page 176. We fully indorse the rules announced in *Hawkins* v. *Shields,* 57 So., and offer it as authority sustaining the lower court, whose decree is in line with the principles announced therein. This case is authority for admission of evidence to show want and failure of consideration as well as in cases of fraudulent and irregular indorsement, etc. Even though appellee did sign the note or indorse it, as claimed, he did so as the evidence clearly shows upon the false and fraudulent representations of his brother, T. J. Morris. As to giving his debt priority, appellee was not only unaccustomed to such deals, sales, etc., but was unable to either read or write; could barely and most poorly sign his name. This transaction has been rightly adjudicated by the lower court.

It will be borne in mind that no demand whatever was ever made on appellee for payment, nor was there any protest of any of these notes. See testimony J. R. Morris, Record pp. 171-2-3-4-5-6-7-8-9 and 10. Complainant, T. J. Morris, took charge of the notes, employed the

attorneys, filed the bill and was its chief prosecutor. It seems that this transaction necessarially involves a loss. Just who should bear this loss is of prime importance; that T. J. Morris was the moving spirit from the beginning, there can be no doubt; he first mentioned and put it on foot; went to Nashville and got the purchaser; made the sale; had his brother, the appellee, to execute the deed, and turn it over to him; he took it off with him; had the trust deed and notes executed according to his liking; fixed everything just as he wanted it; took twenty-five hundred dollars worth of the notes, put them immediately on the market, got the money on them and in as much as he is solvent, and can repay this money, he certainly ought to be required to do so. He is the only man connected with the transaction who realized that anything on the notes to repay it would be a simple return to rightful owners; money which he had no right to keep. It is "Ill gotton gains" and he should not want to keep it for it represents the price of his brother's home. On the other hand if appellee is required to pay these commission notes, he will have to sell his home to raise the money to meet a condition brought about by the fraud practiced on him by his brother T. J. Morris, the lower court took the equitable view of the case, and its finding should not be disturbed.

ETHRIDGE, J., delivered the opinion of the court.

This was a suit brought by E. E. Green and others, appellants, against J. R. Morris and H. B. Johnson, paying for a foreclosure and sale of land to pay notes held by E. E. Green and others, as assignees, which said notes and other notes held by J. R. Morris were secured by deed of trust upon certain lands in Union county, sold by J. R. Morris to H. B. Johnson. The complainants allege that they are *bona-fide* holders for

value without notice of certain of these notes, being
the last notes (amounting to two thousand, five hundred
dollars) of a series of notes for the purchase money
amounting to six thousand dollars.   They allege that
the notes were indorsed by J. R. Morris, and were past
due, and that they had requested Morris to pay the
notes, and had also requested him to have the. land
sold to pay the notes, which he refused to do.   The notes
were all payable to J. R. Morris, and the deed of trust
provided that in case the notes, or any of them, should
become due and were not paid, that the trustee named
in the deed of trust, who is also a complainant in this
suit, should, on the demand of the third party, which
is the appellee Morris, foreclose the deed of trust and
sell the lands to satisfy the debt.   Morris answered
the bill, denying that the appellants were purchasers
for value without notice, and alleging that the whole
transaction was a scheme to defraud him out of his
lands; that his brother and his brother's son-in-law,
who were real estate agents in Memphis, Tennessee,
came to him, and that his brother solicited him to sell
his plantation, representing that he could live upon
the interest of the money it would bring; that he was
getting old and unable to manage the plantation;
and that he agreed that his brother might sell the
property.   He alleges that his brother and King, his
son-in-law, procured one Johnson to buy the lands,
knowing that Johnson was insolvent, and with a view
to defrauding complainant of his lands, and prayed
that the deed of trust and the deed to Johnson be
canceled and declared a fraud upon him. and if that
relief were not granted, that he be decreed to have
first satisfaction of his indebtedness out of the pro-
ceeds of the land, and prayed for a personal judg-
ment against T. J. Morris, his brother, for the money
due on the notes held by the complainants, in case
the proceeds of the land was decreed by the court to

pay the notes held by the complainants. In the evidence J. R. Morris testified that he did not indorse the notes to T. J. Morris, and had never seen the notes until they were presented at the bank for payment, and that the signature upon the back of the notes, purporting to be the signature of J. R. Morris, was a forgery and a fraud. He also produced several witnesses to testify that the signature on the back of the notes was not a genuine signature, and there was a direct and irreconcilable conflict in the evidence as to whether J. R. Morris indorsed the notes.

The chancellor refused to decide this conflict of evidence, holding that there was no consideration for the indorsement by J. R. Morris, if he did indorse it, and then decreed a sale of the lands to pay the notes, giving J. R. Morris a preference by making his notes a preferred lien to be paid first, and charging J. R. Morris with rents upon the lands (he having come into the possession of the lands after the sale to Johnson), and for certain moneys received on a judgment in attachment against Johnson, in which certain personal property was sold. Johnson failed to answer the bill and a *pro confesso* was taken against him. It appears in the evidence, without dispute, that in closing the transaction between J. R. Morris and T. J. Morris, that T. J. Morris held a contract by which J. R. Morris was indebted to him in the sum of nine hundred and fifteen dollars for a stock of merchandise, and this was surrendered by T. J. Morris, and it was agreed that two thousand five hundred dollars worth of the notes maturing last would go to T. J. Morris and his son-in-law for making the sale as a commission. This agreement it appears was made, provided that J. R. Morris would first be paid, and the notes held by J. R. Morris were the first to mature. Johnson defaulted and moved off the place, and J. R. Morris moved into possession of it, attached Johnson and certain personal property upon the place

and had the same sold, and a judgment secured against Johnson and enrolled in the county. The appellants, Green and the other holders of the notes outstanding, each testified that they were bought in good faith, before maturity, and at practically face value. T. J. Morris appears to be solvent, and is a complainant in the bill, though he does not appear to have any interest in the notes, except that he is liable as indorser upon the notes. The chancellor granted a decree, as above stated, giving J. R. Morris a preference, his claim to be first paid, and postponing claim of the appellants until J. R. Morris' claim was first satisfied.

We think that this decree could only be upheld by the chancellor finding as a fact that J. R. Morris did not indorse the notes held by the appellants. The appellants are *bona-fide* purchasers, and if the indorsement is genuine, no oral agreements between J. R. and T. J. Morris would affect them, unless they had notice thereof. Our court has held in several cases, where a series of notes are all secured by a common deed of trust and a common security, that the holders of the notes are entitled to share *pro rata* in case the security is not sufficient to pay all. *Cummings* v. *Oglesby,* 50 Miss. 153; *Murphree* v. *Countiss,* 58 Miss. 717; *Henderson* v. *Herrod,* 10 Smedes & M. 631, 49 Am. Dec. 41.

A consideration of these cases makes it evident that the chancellor's decree was erroneous, and must be reversed. If the chancellor believes from the evidence that there was an agreement between J. R. Morris and T. J. Morris, by which J. R. Morris' notes were to be first paid, a personal judgment should be rendered against T. J. Morris in favor of J. R. Morris for any losses that may come to J. R. Morris on his notes by reason of prorating the proceeds of the sale among all the holders of the notes.

,If the chancellor believes from the evidence that there was no indorsement of the notes by J. R. Morris, of course the, holder of the notes would be postponed, and they would take only such rights, in that event, as T. J. Morris secured by the transaction; provided, of course, that the chancellor believes from the evidence that there was an agreement between J. R. and T. J. Morris that J. R. Morris was to be first paid. The release of the nine hundred and fifteen dollars claim for merchandise purchase money in the evidence would be a sufficient consideration for the assignment of the notes, and there seems to be no dispute as to this fact.

*Order reversed, and cause remanded.*